## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ERIC BERNARD (#R-25398) a/k/a TERRELL KING, | |
| Plaintiff, | Case No. 20-cv-5383 |
| v. | |
| ILLINOIS DEPARTMENT OF CORRECTIONS, et. al. | Judge John Robert Blakey |
| Defendants. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Eric Bernard, an incarcerated individual, brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while he was confined at the Stateville Correctional Center ("Stateville"). [45]. Plaintiff claims that Defendants, employees of the Illinois Department of Corrections ("IDOC") and Wexford Health Sources, Inc., violated his rights under the Eighth Amendment. *Id.* ¶¶ 122–32. Plaintiff also asserts violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq.*, and the Rehabilitation Act, 29 U.S.C. § 701, *et seq.* against Defendant Rob Jeffreys as Director of IDOC. *Id.* ¶¶ 106–21.

Defendants Baldwin, Jeffreys, Miles, and Pfister (together, the "Administrative Defendants") seek partial dismissal of the suit pursuant to Federal Rule of Civil Procedure 12(b)(6). [84]. The Administrative Defendants ask the Court to dismiss Counts I and II, which allege ADA and RA claims against Defendant

Jeffreys in his official capacity; and Count III, which alleges Eighth Amendment claims against all four Administrative Defendants in their individual capacities. *Id.*

For the following reasons, the Court denies Defendants' motion to dismiss [84].

## I.    Background

Plaintiff Eric Bernard suffers from severe disabilities, both mental and physical: without assistance, he cannot walk, stand, sit up, or perform basic tasks such as eating and bathing. [45] ¶ 1. The factual allegations underlying this lawsuit stem from Plaintiff's time at Stateville Correction Center ("Stateville"), a prison operated by the Illinois Department of Corrections ("IDOC"), from May through September 2019. *Id.* In his complaint, Plaintiff alleges that Defendants subjected him to four months of effective solitary confinement and immobility at Stateville. *Id.* Plaintiff alleges that he "remained in diapers that went unchanged for days at a time and was left in an unclean, vermin-infested cell." *Id.* ¶ 2.

The Administrative Defendants moving to dismiss include Rob Jeffreys, John Baldwin, Sherwin Miles, and Randy Pfister. Defendant Jeffreys serves as Acting Director of IDOC, a position he has held since June 1, 2019. [45] ¶ 7. Defendant Jeffreys maintains responsibility for IDOC policy and procedures and oversees the administration of all correctional facilities in the state. *Id.* Defendant Baldwin served as Director of IDOC at "times relevant to this lawsuit." *Id.* ¶ 8. Like Jeffreys, as Director, he maintained responsibility for IDOC policies, procedures, and administration. *Id.* In addition, Defendants Miles and Pfister each served as Warden of Stateville at relevant times. *Id.* ¶¶ 9–10.

Plaintiff suffers from schizophrenia, post-traumatic stress disorder, antisocial personality disorder, and borderline personality disorder. *Id.* ¶ 32. As a result, IDOC classifies him as a "seriously mentally ill" or "SMI" inmate. *Id.* In addition to his preexisting disabilities, on or about March 21, 2019, while incarcerated at Pontiac Correctional Center, Plaintiff suffered a series of strokes leaving him with extreme body weakness and inability to speak, move the right side of his body, walk, stand, or sit up on his own. *Id.* ¶ 34. Following this incident, Plaintiff was hospitalized, underwent a brain biopsy, and was eventually moved to Schwab Rehabilitation Center, where despite some improvement, doctors concluded that he needed extensive care, including occupational, physical, and speech therapy as well as 24-hour nursing care. *Id.* ¶ 35–37. On or about May 3, 2019, Plaintiff was discharged from Schwab and transferred to Stateville, where the facilities lack much of the equipment necessary for his care. *Id.* ¶¶ 39–40.

While at Stateville, Plaintiff remained effectively confined to bed in a small cell except during attorney visits or hospital appointments. *Id.* ¶ 40. When he was moved, he was either transported on a stretcher or physically dragged. *Id.* While his cell had a toilet, he remained unable to use it without help, and no one helped him. *Id.* ¶ 41. Instead, staff put him in diapers, which they left unchanged, forcing Plaintiff to "lie in his own urine and feces for days at a time." *Id.* He did not have access to a shower with grab bars or a seat, and thus remained unable to take a single shower over the course of the four-month period during which he was incarcerated at Stateville. *Id.* ¶ 42.

No one supervised or assisted Plaintiff while he attempted to eat; thus, most of his food fell onto his body, the mattress, and the floor, "where it was often left to accumulate and rot." *Id.* ¶ 43. Numerous employees refused to clean his cell; as a result, the environment attracted vermin. *Id.* ¶ 44. Plaintiff remained unable to access recreational areas, including the outdoors, dayroom, and library; unable to participate in religious, educational, and vocational programming; and unable to take advantage of family visitation opportunities. *Id.* ¶ 45. He was not permitted to make any phone calls, and the only calls he could receive were from his attorney—despite the fact that the facility was equipped with a portable phone. *Id.* ¶ 47. Given his confinement to bed, he was also denied access to the medical and mental health care his providers at Schwab deemed necessary. *Id.* ¶ 48. He did not receive prescribed antipsychotic medications, despite being placed on crisis watch repeatedly. *Id.* ¶ 50.

During his incarceration at Stateville, Plaintiff "repeatedly asked various correctional officers, nurses, wardens, and other staff to provide him with access to areas outside his cell, including but not limited to access to the yard, the library, religious services, and vocational and educational programming." *Id.* ¶ 51. He pleaded with staff to address his conditions, asking to be cleaned, have his diapers changed, have his cell cleaned, and receive various forms of medical care. *Id.* ¶ 51. He made these requests personally to numerous IDOC and Wexford employees named as Defendants in this action. *Id.* In addition, his "repeated requests were also communicated to each of the Defendants responsible for his care plan and well-being," including—as relevant here—Defendants Miles and Pfister. *Id.*

4

Officials ignored Plaintiff's repeated requests for help, and some physically and verbally abused him, "shouting obscenities at him, throwing objects at him, dropping him on his head," and "spraying him with oleoresin capsicum ("OC") foam spray" for behavior like disobeying "orders to stand up," which he was physically unable to do. *Id.* ¶ 52. Staff accused him of fabricating his symptoms despite extensive documentation. *Id.*

Plaintiff made numerous reports. Allegations specific to the Administrator Defendants include the following:

- On or about June 10, 2019, Plaintiff reported that he was denied access to private mental health counseling "because he could not access private rooms outside his cell." *Id.* ¶ 66. The sessions he did have were conducted with a professional standing outside his cell while he was confined to bed—in a setting where officers and personnel could hear. *Id.* Defendant Miles "was made aware of this situation." *Id.*

- On or about June 14, 2019, Plaintiff reported that nursing staff "were not giving him bed baths, cleaning him when they changed his diapers, or assisting with face washing and teeth brushing." *Id.* ¶ 69. Again, "Defendant Miles was made aware of Mr. Bernard's condition." *Id.*

- On or about June 19, 2019, Plaintiff was readmitted to a hospital for "stroke and seizure-like activity and right-side body impairment." *Id.* ¶ 71. Again, he was "covered in urine and feces," and nursing staff refused to clean him. And again, "Defendant Miles was made aware of Mr. Bernard's condition." *Id.* On or about July 15, 2019, Plaintiff reported that he was "still being denied proper medical care, including physical therapy, occupational therapy, confidential mental health sessions, prescribed medication, and dental care," and he "also continued to be denied assistance with grooming, showers, and bed baths, and had been sitting soaked in urine, feces, and food for days in a bed infested with ants and roaches." *Id.* ¶ 73. In addition to the other Defendants to whom Plaintiff reported, "Defendant Miles was also made aware of Mr. Bernard's condition." *Id.*

- Defendant Miles was similarly made aware of Plaintiff's condition on or about July 15, 2019, when Plaintiff reported his conditions and the nursing staff refused to clean him, medical providers refused to treat him because

5

of the conditions in his cell, and he was denied access to the grievance box because he was unable to walk or sit up. *Id.* ¶ 76.

- On or about July 31, 2019, one of the Wexford Defendants "attempted to roll Mr. Bernard on his side, and Mr. Bernard fell off the bed and caught his neck between the bars, causing him to choke and pass out." *Id.* at 78. Again, "Defendant Miles was made aware of this incident." *Id.*

- By August 3, 2019, Defendant Pfister had taken over as Warden. *Id.* ¶ 80. On that day, in a suicidal episode, Plaintiff "swallowed batteries, razors, and a 3 foot tube." *Id.* ¶ 80. Even though at least three staff members personally observed Plaintiff putting metal objects into his mouth, he was not taken to the hospital until four days later. *Id.* Defendant Pfister "was made aware of the incident." *Id.*

- On or about August 4, 2019, Plaintiff was sprayed with OC spray. Defendant Pfister was, again, made personally aware of the incident. *Id.* ¶ 82. Despite IDOC policies requiring officials to flush out an incarcerated person's eyes and exposed skin promptly upon exposure to OC spray, Plaintiff was not cleaned until a day later. *Id.* ¶ 83.

- Defendant Pfister "was made personally aware" again when Plaintiff went on a hunger strike protesting his treatment and conditions in early August. *Id.* ¶ 84. Defendant Pfister was also "made personally aware" when, on August 9, 2019, Plaintiff called "for a crisis member" and was not provided with one—and thus continued his hunger strike. *Id.* ¶ 85. When Plaintiff was found on August 10, 2019, with his upper body off the bed, face down on the floor, Defendant Pfister was made personally aware. *Id.* ¶ 86.

- On or about August 12, 2019, Plaintiff was transferred to a hospital for treatment. Upon his transfer, Plaintiff's mattress "was soaked with urine and was too damaged to be placed back in a cell." *Id.* ¶ 88. Despite the fact that Defendant Pfister was made personally aware of the condition of the mattress and the fact that incident reports were sent to Stateville supervisors documenting the deficiency, IDOC did not provide Plaintiff with another safety mattress for at least 10 days following his discharge from the hospital. *Id.* Without a mattress, Plaintiff slept on a safety blanket on the floor of his cell. *Id.* Defendant Pfister "was made personally aware of this deficiency and signed at least three incident reports describing the problem." *Id.*

- From August 15 to August 20, 2019, Plaintiff engaged in repeated hunger strikes and was put on four-point restraints. *Id.* ¶ 90. Again, Defendant Pfister was made personally aware of these dynamics, as well as additional hunger strikes from August 21 through August 28, 2019. *Id.* at 90–91.

The complaint further alleges that:

> Defendants Miles and Pfister were personally put on notice that Mr. Bernard was denied a proper ADA-compliant cell and equipment, denied access to areas outside his cell, denied adequate medical care, and was subject to inhumane conditions at Stateville. In particular… Defendants Miles and Pfister had actual notice of Mr. Bernard's treatment through numerous incident reports and grievances. Defendants Miles and Pfister were personally on notice that Mr. Bernard suffered from serious medical conditions as diagnosed by physicians, knew that Mr. Bernard was not receiving adequate medical treatment, and acted with deliberate indifference toward Mr. Bernard's conditions. Defendants Miles and Pfister were aware that the conditions Mr. Bernard was subject to would be detrimental to any person's well-being, especially those of an individual suffering mental and physical disabilities like Mr. Bernard.

*Id.* ¶ 92.

In addition, during Plaintiff's time at Stateville, he "was regularly denied access to submit his grievances to the grievance box, which was Stateville's only means of processing inmate's grievances." [45] ¶¶ 76, 97. With assistance from his fellow incarcerated individuals or others, Plaintiff filed numerous emergency grievances, "requesting, among other things, accommodations for his disability and medical attention, and lack of adequate medical care"—all to no avail. *Id.* ¶ 97. Thus, Plaintiff alleges that he exhausted the grievance process. *Id.*

Plaintiff alleges that his experience constitutes part of a "broader systemic crisis across IDOC." *Id.* ¶ 98. Since 2016, IDOC has been subject to a consent decree "concerning IDOC's treatment" of those incarcerated "suffering from serious mental health illnesses." *Id.* ¶ 98. A federal court issued a permanent injunction following IDOC's failure to substantially comply with the consent decree. *Id.* The court "held that Defendant Baldwin's inactions related to these—and other issues—amounted to

deliberate indifference to inmates suffering from serious mental illnesses." *Id.* (citing *Rasho v. Jeffreys*, 1:07-cv-01298, 2021 WL 1602093 (C.D. Ill., May 10, 2016).[1] Several of the inadequacies named in the permanent injunction overlap with Plaintiff's experience, including: an inadequate treatment plan, prolonged crisis watch placement, lack of access to prescribed medication, and improper exposure to OC spray. *Id.* ¶ 99. As "senior level IDOC officials," Defendants Jeffreys, Baldwin, Miles, and Pfister "were all personally aware of these systemic conditions and personally involved in perpetuating these conditions at Stateville," directly causing Plaintiff's injuries. *Id.* ¶ 100.

The Complaint also details the many injuries Plaintiff experienced as a result of his time at Stateville. *Id.* ¶¶ 101–105. Ultimately, Plaintiff's period of incarceration there came to an end when, with the help of an attorney, Plaintiff secured a transfer to Dixon Correctional Facility. *Id.* ¶ 2. He remains incarcerated at Dixon. *Id.* ¶ 1.

## II.   Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that fails to "state a claim on which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss under this rule "tests the sufficiency of the complaint, not the merits of the case*." McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). In considering a motion to dismiss, the Court must accept

---

[1] The Seventh Circuit reversed the issuance of the referenced permanent injunction, *see Rasho v. Jeffreys*, 22 F.4th 703 (7th Cir. 2022). Neither party acknowledges the reversal or otherwise discusses the impact of the court's decision.

all well-pleaded facts in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive, the complaint must give the defendant fair notice of the basis for the claim and state a facially plausible claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Further, a claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## III. Analysis

The Court considers Defendants' challenges to the sufficiency of both the ADA and RA claims against Defendant Jeffreys and the Eighth Amendment claims against all four Administrative Defendants.

### A. Successive Motions

As an initial matter, Plaintiff challenges Defendants' motion to dismiss the ADA and Rehabilitation Act claims as improper under Federal Rules of Civil Procedure 12(g)(2) and 12(h)(2). The Administrative Defendants filed a previous motion to dismiss the First Amended Complaint, [29], which did not challenge the ADA and RA claims. Because Plaintiff's Second Amended Complaint does not alter these claims, Plaintiff argues that the motion before the Court is a successive motion forbidden by Rule 12(g)(2), which states that except "as provided in Rule 12(h)(2) or (3), a party that makes a motion" under Rule 12 "must not make another motion

9

under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Plaintiff, however, also acknowledges that Seventh Circuit precedent specifically interprets 12(b)(6) motions as excluded from 12(g)(2)'s prohibition by Rule 12(h)(2). *See Ennega v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) ("Rule 12(g)(2) does not prohibit a new Rule 12(b)(6) argument from being raised in a successive motion."). Plaintiff points to language from other Courts of Appeals criticizing *Ennega*. *See, e.g. In re Apple iPhone Antitrust Litig.,* 846 F.3d 313, 318 (9th Cir. 2017); *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 321 (3d Cir. 2015). Nonetheless, this Court is bound by the Seventh Circuit's precedent and thus permits the motion.

### B. ADA and Rehabilitation Act Claims against Defendant Jeffreys

In Counts I and II, Plaintiff brings claims under the Americans with Disabilities Act and the Rehabilitation Act, respectively, against Defendant Jeffreys in his official capacity as Director of IDOC. [45] at 28–30. The Seventh Circuit has noted that the statutes require similar proof:

> To establish a violation of Title II of the ADA, "the plaintiff must prove that he is a 'qualified individual with a disability,' that he was denied 'benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was 'by reason of' his disability." *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (citing 42 U.S.C. § 12132). The Rehabilitation Act claim is functionally identical: it requires the plaintiff to allege that "(1) he is a qualified person (2) with a disability and (3) the [state agency] denied him access to a program or activity because of his disability." *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012).

*Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).[2]

Defendants challenge the sufficiency of Plaintiff's ADA and RA claims on three bases: first, they argue that Plaintiff does not sufficiently plead discrimination "by reason of his disability"; second, they argue that Plaintiff improperly attempts to bring a medical malpractice claim under the guise of the ADA and RA; and third, Defendants argue that Plaintiff's ADA and RA claims are moot because the only relief to which he is entitled is injunctive and he has already been transferred to a new facility. The Court considers these three arguments in turn.

### 1. "By Reason of" Disability

Defendants challenge whether Plaintiff has adequately pled the third element of an ADA/RA claim: that he experienced discrimination "by reason of" or "because of" his disability. Defendants assert that "Plaintiff has failed to allege that he was not accommodated by reason of his disability, rather than by reason of Stateville's lack of equipment to accommodate Plaintiff." [84] at 4. Defendants reiterate this position in reply, asserting that "Plaintiff cannot plead that IDOC refused to accommodate Plaintiff because they wanted to treat Plaintiff in a disparate manner, as he has already pled that the delay in accommodation stemmed from Stateville's lack of equipment." [105] at 3.

Defendants interpret the phrase "by reason of" disability to bear on intent, but the Seventh Circuit has clarified that this element centers on causation. Courts

---

[2] The analysis and relief under the Rehabilitation Act, 29 U.S.C. § 794a *et seq.*, and Title II of the ADA, 42 U.S.C. § 12132 *et seq.*, "are similar; the only difference is that "the Rehabilitation Act includes as an additional element the receipt of federal funds, which all states accept for their prisons." *Everett v. Baldwin* (citing *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012) (collecting cases)).

routinely recognize discrimination "by reason of" disability where a defendant fails to provide a reasonable accommodation to a person with a disability. *See Washington*, 181 F.3d at 849; *A.H. v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592–93 (7th Cir. 2018). Indeed, the Seventh Circuit has recognized that "disability discrimination under the Rehabilitation Act and the ADA can be established in three different ways: '(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people.'" *Id.* (quoting *Washington*, 181 F.3d at 847)). A plaintiff need not allege discriminatory intent to satisfy the "by reason of" disability element of an ADA or RA claim. *Id.* at 592.

To the extent Defendants also challenge whether Plaintiff has satisfied the but-for causation requirement of this element, the Court remains satisfied that the allegations have done so. Defendants suggest that Stateville's lack of equipment somehow precludes Plaintiff from demonstrating that Defendants discriminated against Plaintiff "by reason of" his disability. But "lack of equipment" does not automatically exempt Defendants from their duty to accommodate. The appropriate inquiry remains whether Plaintiff has alleged failure to accommodate his disability as a but-for cause of the injury for which he seeks redress. *See A.H. v. Ill. High Sch. Ass'n*, 881 F.3d at 593.

Plaintiff explicitly pleads that Defendant Jeffreys denied him a reasonable accommodation to allow him access to programs and services that would have been available to him "if he did not have disabilities." [45] ¶ 110. That suffices to allege

12

discrimination "by reason of" his disability for purposes of the ADA and RA. Questions about whether Defendants could obtain the equipment necessary to provide Plaintiff's sought-after accommodations may well provide grounds to dispute the reasonableness of the requested accommodations, but do not provide grounds to throw out Plaintiff's complaint at this stage.

### 2. Disability Discrimination and Medical Malpractice

Defendants also seek to dismiss Plaintiff's ADA and RA claims "to the extent Plaintiff challenges the adequacy of the medical treatment he received under guise of an ADA/RA claim." [84] at 2. Defendants submit that Plaintiff's disability claims are repackaged medical malpractice claims, which are not actionable under the ADA or RA.

Plaintiff acknowledges, and the Seventh Circuit has clearly held, that "it would be extremely odd to suppose that disabled persons whose disability is treated negligently have a federal malpractice claim" by virtue of the ADA. *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996); *Resel v. Fox*, 26 F. App'x 572, 577 (7th Cir. 2001) (holding that "a prison official does not violate the ADA when failing to attend to the medical needs of disabled prisoners."). But as pled, Plaintiff's disability discrimination claims do not focus on the quality of the facility's medical services under a malpractice standard of care. Instead, Plaintiff alleges that Defendant Jeffreys failed to make any reasonable accommodations for his disability and did so in a wide variety of areas. Indeed, Plaintiff alleges that Defendant Jeffreys deprived him of access to programs, services, and benefits, including meals, showers, groups,

access to telephones, educational courses, religious services, vocational programming, recreation and work opportunities. [45] ¶¶ 109–112 (ADA), 117–199 (RA). Plaintiff's allegations, which on their face do not reference any standard of medical care, do not constitute improper medical malpractice claims.

### 3. Mootness

Next, Defendants argue that Plaintiff's claims are moot because IDOC transferred him to Dixon, a facility equipped to house inmates with conditions such as Plaintiff's. Plaintiff concedes that any claim for injunctive relief would be moot in view of the transfer but maintains that he has stated a claim for damages.

A plaintiff may only establish a claim to money damages under the ADA and RA where he alleges deliberate indifference. *Lacy v. Cook Cty, Illinois,* 897 F.3d 847, 862 (7th Cir. 2018). Deliberate indifference occurs when "the defendant knew that harm to a federally protected right was substantially likely… and failed to act on that likelihood." *Lacy*, 897 F.3d at 862 (internal citations omitted). In adopting the deliberate indifference standard, the Seventh Circuit explicitly rejected an invidious animus requirement, finding that requiring proof of deliberate indifference better served the ADA's purpose "to combat exclusion that is literally built into our physical and social environment even if it is not motivated by spite or ill will." *Id.* (internal quotations and citations omitted).

In a cursory manner, Defendant argues that Plaintiff has not pled facts sufficient to plausibly allege deliberate indifference. In making this argument, however, Defendant simply imports its deliberate indifference argument from the

Eighth Amendment context by reference and does not make an argument relevant or specific to the law governing Plaintiff's ADA and RA claims. Plaintiff brings his Eighth Amendment claims through the vehicle of 42 U.S.C. § 1983 against Defendants in their individual capacities; ADA and RA claims, on the other hand, permit recovery only against a public entity—here, Defendant Jeffreys stands in for IDOC. *See Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2001) ("Official capacity suits are actions against the government entity of which the official is a part."). In the ADA and RA contexts, courts evaluate knowledge and deliberate indifference attributable to the entity. *See Royer v. City of Elkhart*, No. 3:22-CV-254, 2022 WL 17600377 (N.D. Ill. Dec. 13, 2022) (summarizing current law and discussing nuances and open questions regarding application of the deliberate indifference standard). Although Defendants have not specifically argued the point, the Court notes that Plaintiff's allegations include repeated complaints and grievances regarding his injuries as well as knowledge by high-level officials of the conditions seriously ill inmates face. Such allegations remain sufficient at this preliminary stage.

Defendants also argue that Plaintiff has no claim for damages because he received any accommodations that he might have needed within a reasonable time frame. [84] at 5–6. They assert that "the availability of outside treatment for people with disabilities… does not imply discrimination on the basis of disability. To the opposite, it shows that Jeffreys does not discriminate against people because they

are disabled, but, rather, provides them with [residential treatment] facilities that can accommodate them." *Id.*

According to the complaint, Plaintiff was transferred from Stateville where the alleged violations took place to Dixon after four months. Defendants cite a single inapposite case for the premise that this four-month period constituted a reasonable amount of time to delay provision of Plaintiff's requested accommodations: *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000). In *Jay,* the court found that a 20-month delay in accommodating a plaintiff's request for accommodations reasonable. *Id.* Here, Defendant asks the Court to infer that because 20 months was reasonable in that context, four months constitutes a reasonable delay as a matter of law. Not so. In *Jay*, the court considered a job reassignment as a workplace accommodation in which the employer needed time for a vacancy to arise in a position suitable for the plaintiff. Since evaluating the reasonableness of an accommodation requires a fact-intensive inquiry, *McAllister v. Innovation Ventures*, 983 F.3d 963, 967 (7th Cir. 2020), the Court cannot draw any useful conclusions from *Jay*. Given the nature of the environment and treatment Plaintiff describes (in particular the long delays with regard to toileting and diapers and the failure to provide any shower access), the four-month delay may well be unreasonable.

## C. Eighth Amendment Claims

Defendants also challenge Plaintiff's claims under 42 U.S.C. § 1983, which allege deliberate indifference to conditions of confinement in violation of the Eighth Amendment by all four Administrator Defendants in their personal capacities.

16

The Eighth Amendment prohibits cruel and unusual punishment; detainees are entitled to be confined under humane conditions that provide for their "basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Constitution "does not mandate comfortable prisons, but neither does it permit inhumane ones." *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996).

A prison official "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Johnson v. Prentice*, 29 F.4th 895, 904 (7th Cir. 2022) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The claim thus has "subjective and objective elements, 'each of which must be satisfied.'" *Id.* The plaintiff must "prove that the defendant was subjectively aware of and intentionally disregarded an objectively serious risk to his health or safety." *Id.*

Defendants do not challenge whether Plaintiff's alleged conditions state a plausible claim for violation of the Eighth Amendment: they do. *See Gray v. Hardy*, 826 F.3d 1000 (7th Cir. 2016) (discussing allegations, such as deprivations of "the basic human need of rudimentary sanitation" that suffice to state a claim under the Eighth Amendment). Rather, Defendants allege that Plaintiff cannot properly state a claim against the Administrator Defendants because he has not alleged sufficient personal involvement to plead the second element: deliberate indifference.

Much of Defendants' argument focuses upon the fact that the doctrine of respondeat superior does not apply to actions filed under § 1983. *See Gayton v. McCoy*, 593 F.3d 610, 622 (7th Cir. 2010). But Plaintiff acknowledges this fact. [94] at 9. In a § 1983 suit against a correctional official in his individual capacity, a plaintiff must establish a violation of the law by that particular official. Furthermore, the violation must be at some level an affirmative choice by the defendant; for to assign liability for inaction by supervisors would circumvent the prohibition on vicarious liability. *Soderback v. Burnett County, Wis.*, 752 F.3d 285, 293 (7th Cir. 1985). Thus, in the prison context, "the general responsibility of a warden for supervising the operation of a prison is not sufficient to establish personal liability." *Steidl v. Gramley*, 151 F.3d 739 (7th Cir. 1998) (internal citations omitted).

Inaction in the form of deliberate indifference, however, gives rise to a cognizable claim. Deliberate indifference "means that the official knew that the inmate faced a substantial risk of serious harm, and yet disregarded the risk by failing to take reasonable measures to address it." *Townsend*, 522 F.3d at 773. For example, if "the warden were aware 'of a systematic lapse in enforcement' of a policy critical to ensuring inmate safety, his 'failure to enforce the policy' could violate the Eighth Amendment." *Steidl*, 151 F.3d 739 at 741. That would not constitute vicarious liability, but rather direct liability imposed by knowledge of a risk and a deliberate choice to proceed by way of inaction.

Defendants suggest that Plaintiff must do more than allege knowledge of risk and inaction in the face of that knowledge to plead deliberate indifference. They cite

18

*Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992), for the premise that "the circumstances must suggest that the defendant actually wants the prisoner to suffer harm." [84] at 8. While Defendants quote *Jackson* correctly, they overstate its holding. In *Jackson,* the Seventh Circuit articulated the deliberate indifference standard by stating that failing to intervene in the face of a known risk constitutes a circumstance suggesting that the defendant wants the harm to occur. *See id.* at 22 ("A failure of prison officials to act in such circumstances suggests that the officials actually want the prisoner to suffer the harm.") Defendants imply that Plaintiff would need to allege that they targeted Plaintiff or wished him particular ill will to state a claim. No so. Inaction in the face of a known risk constitutes deliberate indifference; the law does not impose an additional animus requirement.

To state a claim for deliberate indifference to unlawful conditions of confinement, then, a plaintiff must state facts that plausibly allege that the defendant knew of the conditions and proceeded by way of deliberate inaction. Here, Plaintiff alleges that two of the Administrator Defendants—the "Warden Defendants" Miles and Pfister—knew about his conditions of confinement. Defendant Pfister's signature appears, according to the Complaint, on at least three grievances. [45] ¶ 88. Likewise, the Complaint alleges that Defendant Miles signed an incident report documenting the lack of proper medical equipment for moving Plaintiff from one place to another. *Id.* ¶ 62. The Complaint also references "numerous incident reports and grievances" that put Defendants Miles and Pfister "personally" on notice that Mr. Bernard was "denied a proper ADA-compliant cell

and equipment, denied access to areas outside his cell, denied adequate medical care, and was subject to inhumane conditions at Stateville." *Id.* ¶ 92.

Moreover, Plaintiff alleges that the risk would have been clear: "Defendants Miles and Pfister were aware that the conditions Mr. Bernard was subject to would be detrimental to any person's well-being, especially those of an individual suffering mental and physical disabilities like Mr. Bernard." *Id.* And indeed, the Seventh Circuit found in *Gray v. Hardy* that "evidence that the warden 'must have known' about the risk of physical or psychological harm resulting from the unsanitary conditions is sufficient for a jury to find deliberate indifference." 826 F.3d at 1008 (citing *Sanville v. McCaughtry*, 266 F.3d 724, 737 (7th Cir. 2001)).

Defendants, however, argue that Plaintiff does not reach the plausibility threshold by referencing the grievance process. In a prison of thousands, where wardens frequently delegate signature authority to others, Defendants argue that it remains implausible to expect a warden to have actual knowledge of the ailments of a particular inmate. But the Seventh Circuit has held that an "inmate's correspondence to a prison administrator may" establish a basis for "personally liability under § 1983 where the correspondence provides sufficient knowledge of a constitutional deprivation." *Perez v. Fenoglio*, 792 F.3d 768, 781–82 (7th Cir. 2015). In *Gray*, the Seventh Circuit found a grievance signed by Defendant Pfister's predecessor, Warden Hardy, sufficient to create a triable issue of fact on the question of deliberate indifference at the summary judgment stage. 826 F.3d at 1008. Here,

20

at the motion to dismiss stage, the Courts finds that Plaintiff has sufficiently stated a claim for deliberate indifference as to Defendants Miles and Pfister.

Defendants also suggest that Plaintiff's allegations, at most, show that the Warden Defendants knew of the alleged violations after the fact. [105] at 2. They misread the complaint: it describes an ongoing series of events of which the Warden Defendants were apprised, not an after-the-fact revelation.

Moreover, Plaintiff does not allege that the Director Defendants (in contrast to Miles and Pfister) knew of his individual circumstances. Instead, he seeks to establish personal liability based upon a theory regarding widespread policies and practices within IDOC. The Seventh Circuit has permitted claims on this basis, finding reasonable the inference that high-level administrators can be expected to know about "systemic"—as opposed to isolated or individualized—conditions. *Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir. 1996). At the motion to dismiss stage, the *Antonelli* court considered simply whether the violations alleged were "potentially systemic." *Id. See also Smith v. Dart*, 803 F.3d 304, 310 (7th Cir. 2015) ("[T]he personal involvement of senior jail officials, such as [Sheriff] Dart, can be inferred at the motion to dismiss stage, where, as here, the plaintiff alleges potentially systemic, as opposed to clearly localized, constitutional violations.").

Here, Plaintiff argues that his suffering resulted from a wide-spread pattern regarding the treatment of seriously mentally ill inmates. Plaintiff alleges that prior litigation, including a permanent injunction put in place by a federal district court, put the Director Defendants on notice of the risks posed to SMI inmates by

21

widespread practices including inadequate delivery of prescribed antipsychotic medications, inadequate treatment plans, prolonged crisis watch placement, and the unnecessary use of OC spray as a form of discipline. [45] ¶ 99. According to Plaintiff, Defendants' inaction in the face of this knowledge perpetuated the practices and actively contributed to Plaintiff's injuries. *Id.* ¶100.

Plaintiff cites several cases in which courts in this district have recognized that evidence of prior litigation, while not admissible as substantive evidence, may properly be considered with regard to notice. *See Dodson v. Cook Cty. Jail*, No. 16-cv-0345, 2019 WL 764041, at *4 (N.D. Ill. Feb. 21, 2019); *Towns v. Dart,* No. 14 C 9617, 2017 WL 4572209, at *4 (N.D. Ill. Oct. 13, 2017); *Daniel v. Cook Cty.*, 833 F.3d 728, 743 (7th Cir. 2016)); *Thompson v. Taylor*, No. 13 C 6946, 2016 WL 5080484, at *9 (N.D. Ill. Sept. 20, 2016). Here, to the extent Plaintiff's allegations of harm overlap with those of which the Director Defendants were made aware through prior litigation, the complaint sufficiently states a claim against the Director Defendants. While Defendants remain free to contest Plaintiff's evidence of deliberate indifference, Plaintiff's allegations meet the threshold—mere plausibility—required to survive a motion to dismiss.[3]

Finally, as they did with reasonable accommodations under the ADA and RA, Defendants here again attempt to make a causal argument of sorts, stating that "Plaintiff's alleged exposure to feces can be attributed to his inability to use the toilet,

---

[3] The Court notes that the systemic theory provides another basis upon which a jury could infer deliberate indifference by the Warden Defendants as well as the Director Defendants. While some of Plaintiff's allegations may be localized, others are potentially systemic, such as his allegation that the facility's lack of equipment led staff to drag him from place to place.

because Stateville allegedly did not have an accessible toilet." [84] at 9. From this, they apparently conclude that "taken as true," Plaintiff's Second Amended Complaint "shows that at most, Stateville was ill-equipped to house Plaintiff, who was disabled." *Id*. Again, inadequate facilities does not automatically preclude an Eighth Amendment claim. To be sure, Defendants cite no case to suggest that leaving a disabled, incarcerated person lying in his own feces for days on end ought to be excused based on the model of toilet installed in a facility. Plaintiff states a claim.

## IV.    Conclusion

For the reasons described above, the Court denies Defendants Jeffreys, Baldwin, Miles, and Pfister's motion to dismiss, [84].

Dated: February 15, 2023

                    ENTERED:

                    John Robert Blakey
                    United States District Judge

23