**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Eric Bernard, *Plaintiff*, v. Illinois Department of Corrections, *et al.*, *Defendants*. | No. 20 CV 5383 Judge Lindsay C. Jenkins |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Eric Bernard ("Bernard"), an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this civil rights action under 42 U.S.C. § 1983 against various IDOC employees and medical providers employed by IDOC-contracted health care services provider, Wexford Health Sources, Inc. (collectively, "Defendants"). [Dkt. 45.] In the operative complaint, Bernard alleges that Defendants violated his rights under the Eighth Amendment, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act during his four-month period of confinement at Stateville Correctional Facility ("Stateville"). [*Id.*]

Defendants previously moved for summary judgment based on Bernard's alleged failure to exhaust his administrative remedies under Seventh Circuit precedent, *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008) ("*Pavey I*"). [Dkts. 130; 134.] The Court granted in part and denied in part the motions, determining that a *Pavey* hearing was necessary to resolve certain material disputes of fact presented by some

1

of the grievances (Plaintiff's Exh. A-4–A-46 and B-13). [Dkt. 190 at 19–20, 26–27.][1] The Court held a *Pavey* hearing in December 2023, and the parties submitted post-hearing briefs. [Dkts. 217; 218; 221; 222.] For the reasons stated below, summary judgment is denied.

I. Background[2]

    A. The Grievances: Plaintiff's Exhibits A-4–A-46 and B-13

Bernard suffers from various disabilities: he has been diagnosed with mental health illnesses, including schizoaffective bipolar disorder, posttraumatic stress disorder, borderline disorder, and antisocial personality disorder. [Dkt. 182, ¶2.] In addition to these preexisting disabilities, in March 2019, Bernard suffered a severe medical event while incarcerated at Pontiac Correctional Center, and he was subsequently hospitalized and later transferred to Schwab Rehabilitation Center ("Schwab") for rehabilitative therapy. [Dkt. 171, ¶6.] As a result, Bernard was partially physically impaired and bedridden for months. [Dkt. 182, ¶¶1, 38.]

Upon his discharge from Schwab on May 3, 2019, Bernard was sent to Stateville, where he was classified as "seriously mentally ill." [Dkts. 171, ¶6; 182, ¶¶2–3, 35.] Bernard remained at Stateville until September 6, 2019, when he was transferred to Dixon Correctional Facility ("Dixon"), where he currently resides. [Dkt. 182, ¶35.]

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.
[2] The Court provided a fulsome background of this case and an overview of the relevant grievance procedures for IDOC inmates in its August 28, 2023 Order ("Order") [Dkt. 190.] Given the large number of grievances, the Court only includes facts needed for its exhaustion analysis.

While at Stateville, Bernard filed dozens of grievances concerning the lack of reasonable accommodations under the ADA and the Rehabilitation Act, as well as his treatment, conditions of confinement, and medical care. [*Id.*, ¶¶3, 14.] At issue here are forty-three emergency grievances, Plaintiff's Exh. A-4–A-46, and one non-emergency grievance, Plaintiff's Exh. B-13, all of which were filed between May 6 and July 27, 2019. [Dkt. 190.]

As to the forty-three emergency grievances, all were denied by the Chief Administrative Officer ("CAO") at Stateville as non-emergencies, with an explanation that each "emergency [was] not substantiated" and that Bernard "should submit this grievance in the normal manner." (Plaintiff's Exh. A-4[3] –A-46). [Dkt. 182, ¶¶3, 5.] Upon receiving the returned grievances, Bernard submitted thirty-three of them (Plaintiff's Exh. A-4–A-36) to the Administrative Review Board ("ARB") rather than to the Statesville Grievance Office. [*Id.*, ¶6.] Bernard attached a cover letter to the ARB dated July 22, 2019 explaining the situation was "an emergency because I am not getting the medical and rehabilitative care I need." [Dkt. 217-2 at 1–2.] On August 6 and August 18, 2019, the ARB marked Bernard's grievances as received and answered by sending Bernard a form entitled "Return of Grievance or Correspondence," that explained why each grievance "is being returned." [*See, e.g.*,

---

[3]     Plaintiff's Exhibit A-4 is also exhausted because it was re-filed as a non-emergency grievance, Plaintiff's Exhibit B-10, on June 19, 2019. [Dkt. 214 at 45–52 (McBee conceding at the *Pavey* hearing that Plaintiff's Exhibit A-4 and Plaintiff's Exhibit B-10 are nearly identical); *compare* Dkt. 172-2 at 17–29, *with* Dkt. 172-3 at 41–43.] The Court has already determined that Plaintiff's Exhibit B-10 was exhausted because it was properly filed at Stateville, remained unresolved for months, and effectively required Bernard to "start over." [Dkt. 190 at 25.]

3

Dkt. 172-2 at 33]. As for the other ten returned grievances, which were denied as emergencies by the CAO on August 23, 2019, Bernard took no further action. (Plaintiff's Exh. A-37–A-46.)

On the non-emergency grievance (Plaintiff's Exh. B-13), Bernard sent the original grievance to the Stateville Grievance Office on July 17, 2019. [Dkt. 182, ¶14.] The Grievance Office denied it on the merits, and the CAO subsequently concurred with the denial on July 31, 2019. [Dkt. 172-3 at 54–76.] Bernard did not file an appeal of this grievance with the ARB.

Bernard maintains that he never received the ARB's responses to his emergency grievances or the CAO's denial of the non-emergency grievance because he was on crisis watch or medical furlough during most of August and part of September 2019. [Dkt. 170, ¶27.] This status, he argues, made the grievance process unavailable because inmates on medical furlough generally do not have access to their mail or an offsite grievance box, [*see* Dkts. 182, ¶¶32–34; 172-8 at 22; 218 at 9–10; 221 at 6 n.2], and inmates on crisis watch are not allowed writing implements or paper and are generally confined to their cell. [Dkt. 182, ¶¶33, 38.]

### B. The Hearing

To resolve the factual disputes surrounding exhaustion, the Court held a *Pavey* hearing on December 13–14 and December 20, 2023. [Dkt. 190 at 19–20, 26–27.] The Court received evidence on the following questions: (1) the dates in July, August, and September of 2019 that Bernard was on crisis watch or medical furlough and how it interfered with the grievance filing window; (2) what restrictions were in place regarding Bernard's access to the grievance process while on crisis watch or medical

4

furlough; (3) whether Bernard or anyone else requested any correctional staff to aid with the grievance process during this time; and (4) when, or if, Bernard received responses from the ARB, CAO, and Stateville correctional counselor regarding these grievances. [*Id.*] The Court heard testimony from: (1) Bernard, (2) Anna McBee ("McBee"), a Stateville Counselor, (3) Sara Johnson ("Johnson"), a Dixon Counselor, (4) Brett Wells ("Wells"), a Dixon Counselor and later a Dixon Grievance Officer, and (5) Margaret Madole ("Madole"), ARB Chairperson.[4]

## II. Analysis

### A. Exhaustion of Available Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust their facility's administrative remedies before bringing civil rights suits concerning prison conditions. 42 U.S.C. § 1997e(a); *see also Miles v. Anton*, 42 F.4th 777, 780 (7th Cir. 2022). "Failure to exhaust is an affirmative defense, so the defendants bear the burden of proof and cannot shift it to require [the plaintiff] to show that administrative remedies were unavailable." *Gooch v. Young*, 24 F.4th 624, 627 (7th Cir. 2022) (citation omitted*); see Davis v. Mason*, 881 F.3d 982, 985 (7th Cir. 2018) (holding that "[i]t was not [plaintiff's] burden to establish that the grievance process was unavailable"). "Courts analyze a prisoner's exhaustion under the preponderance of the evidence standard." *Price v. Fed. Bureau of Prisons*, 2022 WL 972294, at *3 (N.D. Ill. Mar. 31, 2022) (collecting cases); *Williams v. Baldwin*, 239 F. Supp. 3d 1084, 1089 (N.D. Ill. 2017).

---

[4] The *Pavey* hearing was conducted jointly with Case No. 23-cv-5368, a related case filed by Bernard.

The Court's previous Order contained a fulsome discussion of the grievance process outlined in the Illinois Administrative Code, Ill. Admin. Code tit. 20, §§ 504.800 *et seq*. In sum, IDOC's grievance procedures first require inmates to file their grievance with a counselor within 60 days of the discovery of "the incident, occurrence or problem that [gave] rise to the grievance." § 504.810(a). A Grievance Officer must "consider the grievance and report his or her findings and recommendations in writing to the Chief Administrative Officer within two months after receipt of the grievance, when reasonably feasible under the circumstances." § 504.830(e). If the inmate is not satisfied with the CAO's response, he can file an appeal to the Director of the IDOC through the ARB.

The PLRA exhaustion requirement "does not 'demand the impossible.'" *Lanaghan v. Koch*, 902 F.3d 683, 688 (7th Cir. 2018) (citation omitted). A prisoner is not required to exhaust the administrative remedies if those remedies are not "available." *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). "An 'available' remedy is one that is 'capable of use for the accomplishment of a purpose' and 'is accessible or may be obtained.'" *Crouch v. Brown*, 27 F.4th 1315, 1320 (7th Cir. 2022) (quoting *Ross v. Blake*, 578 U.S. 632, 642 (2016)). Availability of a remedy is not solely "what appears on paper, but, rather, whether the paper process was *in reality open* for the prisoner to pursue." *Wilder v. Sutton*, 310 F. App'x 10, 13 (7th Cir. 2009) (emphasis added); *see Schultz v. Pugh*, 728 F.3d 619, 620 (7th Cir. 2013) (explaining that for an administrative remedy to be available, it must "be available in fact and not merely in form.").

Broadly speaking, there are at least three circumstances when administrative remedies can be considered unavailable under the PLRA. *Ross*, 578 U.S. at 643. First, if an administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"—then it is not available to inmates. *Id.* Second, if administrative rules are so opaque or confusing that "no reasonable prisoner can use them," they are not considered available. *Id.* at 644 (cleaned up). Third, if prison administrators or staff "thwart inmates from taking advantage of a grievance process[,]" then the process is unavailable. *Id.* This can happen through "affirmative misconduct," such as refusing to provide or respond to grievance forms or threatening inmates with negative consequences for grieving. *Hernandez v. Dart*, 814 F.3d 836, 840, 842 (7th Cir. 2016); *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) ("a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance.").

### B.  Findings of Fact

On the basis of the evidence introduced at the hearing, the Court determines the following facts:

First, as it relates to the dates in 2019 when Bernard was on crisis watch or medical furlough and how the time interfered with the grievance process, the Court finds that Bernard was on continuous crisis watch from August 3 to September 5, 2019, including for a period of medical furlough from August 12 to August 15, 2019.[5]

---

[5]  Because neither party presented evidence regarding the dates Bernard was on crisis watch or medical furlough in July 2019, the Court lacks sufficient information to make a finding for that month. [Dkts. 217; 218; 221; 222.]

7

At the hearing, Bernard testified that he spent "the whole month" of August 2019 at Stateville on crisis watch. [Dkt. 215 at 62 (Tr. 300:16–23).] The timeline outlined in Bernard's crisis care records reveals that he was on continuous crisis watch at Stateville from August 3 to September 5, 2019 (minus three days in August of medical furlough), a fact that McBee did not dispute. [Dkts. 172-12 at 4; 214 at 54 (Tr. 54:2–10).] Although Defendants have argued that Bernard was on crisis watch for far less time, [Dkt. 182, ¶¶32, 36], they did not present any evidence—at the hearing or in post-hearing briefing—to rebut this time frame.

Regarding what restrictions were in place while Bernard was on crisis watch or medical furlough, the Court finds that Bernard did not have access to writing implements (*i.e.*, pens, pencils, and paper), institutional mail, or the grievance box while on crisis watch or on medical furlough. At the hearing, Bernard testified that he did not have access to these items, and only had a safety blanket and a safety smock. [Dkt. 215 at 62–63 (Tr. 300:24–301:13); *id.* at 78–79 (Tr. 316:21–317:8).] He testified similarly regarding his medical furlough at an outside facility. [*Id.* at 64–65 (Tr. 302:23–303:11).] Johnson, a counselor at Dixon, acknowledged that inmates on crisis watch do not have access to paper or writing implements and thus cannot physically write grievances themselves. [Dkt. 214 at 188–89 (Tr. 188:18–189:11) ("If he wanted to write a grievance, he would have to ask his counselor to request permission from mental health or he would have to ask the counselor to write it.").] Likewise, McBee acknowledged that inmates on medical furlough have their mail

8

held, and inmates on crisis watch do not have access to institutional mail until they are taken off crisis watch. [*Id.* at 59–60 (Tr. 59:15–60:18).]

Defendants argue that the grievance process was nevertheless available to Bernard during this period because he could have dictated a grievance or a response to a counselor who was required to assist him upon request. [Dkt. 214 at 26–29; 217 at 4–5; Dkt. 222 at 2–3.] But the Court agrees with Bernard that this argument relies on testimony concerning what *should* happen when an inmate on crisis requires access to the grievance process—not what in fact occurred.

McBee testified she was not personally aware of whether other counselors agreed to assist or tried to assist Bernard with filing grievances or responses while he was on crisis watch, nor did she personally assist him. [*Id.* at 57 (Tr. 57:17–24).] She also explained that before a counselor could assist an inmate on crisis watch, mental health staff must first determine if the inmate is "stable enough" to file a grievance. [Dkt. 214 at 26–27 (Tr. 26:22–27:21); *id.* at 72–73 (Tr. 72:12–73:14); *id.* at 189 (Tr. 189:3–17).] Finally, Bernard testified that while on crisis watch, he asked staff members whom he came in contact with for help—including mental health staff and a counselor named Barea Miggins—but no assistance was provided.[6] [Dkt. 215 at 63–64 (Tr. 301:14–302:12, Tr. 302:2–8); *id.* at 58–59 (Tr. 296:24–297:18).] Considering the record as a whole, the Court finds that, to the extent Bernard

---

[6] Bernard also testified that he was unaware if he could request assistance with grievances while offsite on medical furlough, and that no one offered him any assistance during this time. [Dkt. 215 at 65 (Tr. 303:12–21).]

requested correctional staff assist with the grievance process during this time, those requests for assistance went unanswered.

Regarding the fourth inquiry, the emergency grievances were initially denied and returned to Bernard by the CAO with an explanation that they had been improperly filed as emergencies and had to be resubmitted "in the normal manner." [Dkt. 182, ¶¶3, 5.] Bernard did not resubmit these grievances to the Stateville Grievance Office. Instead, he resubmitted thirty-three of them to the ARB with a letter explaining why the circumstance was "an emergency." [Dkt. 217-2 at 1-2.][7] By the time the ARB responded on August 6 and August 18 explaining why the grievances were being returned, Bernard was on crisis watch or medical furlough without access to mail, pens or paper. [Dkt. 214 at 54, 59–60, 188–89.] The same is true for the ten returned grievances denied as emergencies by the CAO on August 23. Plaintiff's Exh. A-37–A-46. Bernard took no further action on these grievances because he was on crisis watch without access to writing materials.

The Seventh Circuit has addressed the question of "what happens when a response to a grievance does not reach the prisoner, and so he does not know when to

---

[7] The Court rejects Defendants argument that Bernard failed to exhaust his administrative remedies because he was *required* to resubmit the emergency grievances to the grievance office and only to the grievance office. [Dkt. 217 at 10.] At the hearing, McBee testified that when an emergency grievance is denied as a non-emergency, "[i]t wouldn't necessarily be considered improper" to resubmit the grievance directly to the ARB. [Dkt. 214 at 23 (Tr. 23:18–24).] According to McBee, "DR 504, which is the Department Rule that governs grievances, states that if an individual feels like he would not receive a fair hearing, he can send those grievances directly to the ARB." [*Id.*] Thus, the CAO's response—directing Bernard to re-submit the grievances "in the normal manner"—is, put simply, "a vague instruction that effectively required [Bernard] to start over." *See* Summary Judgment Order, *Bernard v. Does*, No. 20 C 1367, at 7 (C.D. Ill. Sept. 13, 2021), ECF. No. 66.

10

move along to the next step?" *Pyles v. Nwaobasi*, 829 F.3d 860, 868 (7th Cir. 2016). Failure to provide evidence of a "timely and accurately transmitted [ ] response" means that the defendant does not "enjoy a presumption of receipt." *Id*.

Here, as in *Pyles*, Defendants have not come forward with competent evidence establishing that Bernard received responses from the ARB and CAO after his crisis watch began on August 3. Madole testified that once the ARB responds to a grievance, it is sent to the inmate's facility for delivery, and the ARB retains no information about what happens to the mail at the facility level, including for an inmate on crisis watch. [Dkt. 214 at 98–99 (Tr. 98:5–99:7).] No witness testified to delivering any responses to Bernard once the crisis watch ended on September 5, or at any time prior to his transfer to Dixon on September 6. Therefore, Defendants have not met their burden of establishing that Bernard failed to exhaust his available administrative remedies as to the emergency grievances Plaintiff's Exhibits A-4–A-46.

The Court reaches the same conclusion as to Exhibit B-13, the non-emergency grievance dated July 22 that was denied by the Stateville Grievance Office on July 31. The next step would have been for Bernard to file a written appeal to the ARB within thirty days, but the record contains no evidence that Bernard actually received the denied grievance before his crisis watch began on August 3.[8] Because Bernard never received the counselor's response, Defendants have not met their burden of

---

[8] Even if Bernard had promptly received the July 31 response, his crisis watch began on August 3 and continued for more than 30 days. Without access to a pen or the grievance box, it would have been nearly impossible for him to timely appeal to the ARB.

11

establishing that Bernard failed to exhaust his available administrative remedies as to Plaintiff's Exhibit B-13. *Pyles*, 829 F.3d at 868–69.

Accordingly, Defendants motions for summary judgment for failure to exhaust administrative remedies is denied.[9]

### III. Conclusion

For the reasons stated above, Defendants' motion for summary judgment for failure to exhaust administrative remedies is denied.

Enter: 20-cv-5383
Date: May 13, 2024

_____
Lindsay C. Jenkins
United States District Judge

---

[9] The Wexford Defendants seek to rehash their argument that Bernard failed to provide them with proper notice and thus failed to exhaust his administrative remedies as to eleven grievances the Court already determined were exhausted (Plaintiff's Exh. A-1–A-3, B-1, B-3–B-10, B-11–B-12). [Dkts. 217 at 12–15; 222 at 4–5.] The Court already explained that Plaintiff's Exh. A-1–A-3, B-1, B-3–B-4 put the Wexford Defendants on notice of Bernard's alleged concerns about deficient medical care with a fair opportunity to respond. With respect to the other exhausted grievances (Plaintiff's Exh. B-5–B-10, B-11–B-12), Wexford's failure to raise this argument in its original motion for summary judgment constitutes waiver.

12